21CA1444 Peo v Peters 02-20-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 21CA1444
El Paso County District Court No. 18CR4176
Honorable Marcus S. Henson, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Mark Christopher Peters,

Defendant-Appellant.

---

JUDGMENT AND SENTENCE AFFIRMED

Division VI
Opinion by JUDGE WELLING
Brown and Moultrie, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced February 20, 2025

---

Philip J. Weiser, Attorney General, Grant R. Fevurly, Senior Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, River B. Sedaka, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1    Defendant, Mark Christopher Peters, appeals his judgment of conviction and sentence for one count of felony murder, two counts of stalking, and one count of tampering with physical evidence. We affirm.

## I.    Background

¶ 2    Peters was married to the victim, M.P., but as of 2018, Peters and M.P. were separated and going through a divorce. While the divorce was pending, M.P. moved in with her daughter, R.L. According to R.L., very few people knew her address and, to her knowledge, no one had given Peters her address.

¶ 3    On July 12, 2018, Peters went to the home of R.Y., a friend of M.P.'s. There was conflicting testimony about what happened next. R.Y. testified that Peters kidnapped him at gunpoint, forced him to begin driving, and asked him to go to R.L.'s house. R.Y. further testified that he told Peters that he couldn't remember where R.L. lived, which angered Peters. According to R.Y., after he told Peters that he couldn't remember R.L.'s address, Peters asked R.Y. to call M.P. R.Y. tried to call M.P., but she didn't answer. R.Y. then called R.L., who answered and gave the phone to M.P. M.P. gave R.L.'s

address to R.Y. after he told her that he had car parts to drop off. R.Y. testified that Peters overheard this conversation.

¶ 4 Contrary to R.Y.'s account of what happened, Peters testified that he didn't kidnap R.Y. And Peters's friend, D.B., testified that Peters and R.Y. came to her house that day, and it didn't appear to her that R.Y. had been kidnapped.

¶ 5 One day later, on July 13, 2018, Peters went to R.L.'s house while wearing a wig and holding a pamphlet. He took D.B.'s gun to the door with him. According to R.L., M.P. heard the doorbell ring, went to the door, looked through the peephole, and said, "There's a woman at the door." R.L. then went to the door, and she also thought she saw a woman at the door with her back turned. R.L. testified that, because of what appeared to be pamphlets in the visitor's hand, she assumed the person at the door was a canvasser. R.L. went to open the door and "before [she] knew it," the door pushed open into her face. She then realized that it was Peters who was at the door, wearing a wig. R.L. testified that she then attempted to shut the door, but Peters had his foot in the door and was "waving his gun." R.L. yelled to M.P. that Peters was at the door. According to R.L., M.P. initially became panicked and went to

2

her room, but she then came out of her room to help R.L. try to keep Peters out of the house. Peters then shot through the door, hitting M.P. in the head and killing her. R.L. testified that she then said, "You fucking shot my mom in the head," and Peters fled. During his testimony, Peters denied that he lodged his foot in the door.

¶ 6 Peters was arrested and charged with three counts of murder in the first degree — after deliberation, felony murder, and extreme indifference — one count of attempted murder in the first degree, three counts of second degree burglary, two counts of stalking, one count of tampering with physical evidence, three counts of first degree kidnapping, and one count of second degree kidnapping. At trial, Peters asserted self-defense. The jury convicted Peters of first degree felony murder, second degree murder as a lesser included offense of first degree murder after deliberation, two counts of second degree burglary, two counts of stalking, and tampering with physical evidence. The jury acquitted Peters of all the other charges.

¶ 7 The trial court merged the second degree murder conviction and the burglary conviction into the first degree felony murder

3

conviction and sentenced Peters to a controlling sentence of life without the possibility of parole (LWOP) (with the sentences for stalking and evidence tampering running concurrently to one another and the LWOP sentence).

## II.    Analysis

¶ 8    Peters raises five arguments on appeal.  He contends that (1) the trial court exhibited bias against him; (2) the trial court erroneously admitted R.L.'s hearsay statements; (3) there was pervasive prosecutorial misconduct during voir dire and closing argument; (4) even if each isolated error doesn't warrant reversal, the cumulative prejudice of the errors warrants reversal; and (5) his LWOP sentence constitutes cruel and unusual punishment.  We consider, and reject, each contention below.

### A.    Whether the Trial Court Exhibited Bias During D.B.'s Testimony

¶ 9    Peters contends that we must reverse his judgment of conviction because the trial court exhibited judicial bias by (1) reminding D.B. of her oath to testify truthfully during her testimony and (2) giving the jury a credibility instruction during

D.B.'s testimony.  We aren't persuaded that the trial court exhibited any bias.

## 1.    Additional Facts

¶ 10    At trial, the prosecution called D.B. to testify.  Even from the flat transcript, it's clear that D.B. was a challenging witness.  During her testimony, D.B. frequently had trouble recollecting what she had told police and had difficulty understanding the prosecutor's questions.  D.B.'s testimony was also interrupted twice after she expressed concerns about perjuring herself.  In both instances where D.B. raised this concern, the court appointed D.B. her own counsel and took a recess to permit D.B. to discuss her concerns with her appointed counsel.

¶ 11    During the prosecutor's direct examination of D.B., the following exchange occurred:

> THE COURT: Hold on just a second.  Ma'am, I appreciate that this is difficult, and it may be frustrating for you.  I can also appreciate that it may be difficult and frustrating for counsel.  He's trying to get answers to questions.  And I think you are struggling to try to make sure that you give him maybe the answer to the question you believe he's asking.
>
> [D.B.:] I don't understand his questions is —

THE COURT: And bear with me. What I'm going to do is I'm just going to say at this stage, if you don't understand the question, before you even try to answer it, just say, I'm not sure I understand. Could you ask it a different way?

[D.B.:] Okay.

THE COURT: I think that may be part of where the confusion lies. Okay?

[D.B.:] Okay.

THE COURT: The other thing I'm going to ask you to do, ma'am, is *to the best of your ability, just answer the questions truthfully. That's what the oath requires you to do.*

[D.B.:] I am — okay.

(Emphasis added.) Peters didn't contemporaneously object.

¶ 12    Later, during the prosecutor's redirect examination of D.B., the prosecutor asked her whether Peters had seemed fixated on his frustrations with M.P. Peters objected as to speculation and, when overruling the objection, the trial court sua sponte instructed the jury as follows:

Folks, I want to share with the jury that you need to understand that at the end of all of this, you are going to be given an instruction that is going to require you to decide what weight maybe you give to the testimony of a witness based on other evidence and how you view things in the whole.

6

> And so you will need to be reminded at this point that you are going to have to make some decisions about how you want to treat the testimony and what you may want to believe or not believe based on all the other evidence.

Peters didn't contemporaneously object to this but, at a sidebar later on in D.B.'s testimony, he objected and asked that in the future the court consult with counsel before interjecting instructions. In response, the court explained its thought process:

> [D.B.'s] testimony has gone on as long as it has to the extent that there have been multiple instances where the witness has been asked to make comments. And it was raised actually most recently in advance of my giving this instruction to comment potentially on the credibility of some other witness. And so that was part of what prompted me to want to give a bit of that direction to the jury.

### 2. Legal Principles and Standard of Review

¶ 13 In our justice system, it's axiomatic that a judge "be free of all taint of bias and partiality." *People v. Jennings*, 2021 COA 112, ¶ 18. Because bias and partiality must be avoided, the trial judge "must exercise restraint to maintain an impartial forum" even though he or she "has wide discretion in conducting a trial." *People v. Acosta*, 2014 COA 82, ¶ 92.

¶ 14     A judge's disqualification is warranted when the judge shows either actual bias or an appearance of impropriety.  *See People v. Garcia*, 2024 CO 41M, ¶ 21.  But "while both an appearance of impropriety and actual bias are grounds for *recusal* from a case, only when the judge was actually biased will we question the result."  *Id.* (quoting *Sanders v. People*, 2024 CO 33, ¶ 50).

¶ 15     Actual bias "is bias 'that in all probability will prevent [a judge] from dealing fairly with a party.'"  *Jennings*, ¶ 20 (alterations in original) (quoting *People in Interest of A.G.*, 262 P.3d 646, 650 (Colo. 2011)).  Disqualification based on actual bias isn't waivable.  *Id.* at ¶ 21.  When asserting that a trial judge was biased, the defendant "must establish that the judge had a substantial bent of mind against him or her."  *Id.* at ¶ 28 (quoting *People v. Drake*, 748 P.2d 1237, 1249 (Colo. 1988)).  Such bias must be clearly established in the record.  *Id.*

¶ 16     We review de novo whether a trial judge's recusal was required.  *Sanders*, ¶ 25.  If an actually biased judge presided over a trial, reversal is required because it constitutes structural error.  *Garcia*, ¶ 21; *Hagos v. People*, 2012 CO 63, ¶ 10.

### 3. The Trial Court Didn't Exhibit Bias

¶ 17 We acknowledge that under certain circumstances, a trial judge's comments on the credibility of a witness may evince bias or partiality. *See People v. Rogers*, 800 P.2d 1327, 1328-29 (Colo. App. 1990). But given the context in which the trial court reminded D.B. of her oath and instructed the jury on its role in assessing credibility during D.B.'s testimony, we don't discern that the trial judge evinced bias or partiality in this case.

¶ 18 First, D.B. was a prosecution witness, so it's counterintuitive that an admonition or instruction given while a prosecution witness is testifying on direct or redirect would evince a bias against the defendant. While portions of D.B.'s testimony may have benefitted the defense, that the trial judge only interrupted the prosecution during the examination of its own witness cuts against any inference that the trial judge was exhibiting actual bias against Peters or an appearance of impropriety in either instance.

¶ 19 Second, when the trial judge reminded D.B. of her oath during her testimony, it was after D.B. had repeatedly told the prosecutor that she didn't understand the questions and stated that she felt the prosecutor was "going around in circles." Based on the record

and the surrounding context, it appears that the trial judge sensed that both D.B. and the prosecutor were becoming increasingly frustrated during their exchange. In this context, the trial court's decision to remind D.B. of her oath doesn't indicate that the trial judge had either a "substantial bent of mind" or prejudice against Peters. *See Jennings*, ¶ 28; *see also Sanders*, ¶¶ 45-46. Rather, it appears that the trial court was simply attempting to cut through the frustration and keep D.B.'s testimony moving.

¶ 20    Similarly, the trial judge gave the credibility instruction during D.B.'s testimony after the prosecution had asked her to speculate on Peters's feelings of frustration toward M.P. and before permitting D.B. to testify as to whether Peters seemed fixated on his marital problems. While the timing of the instruction may not have been ideal, when considering the context in which the court gave the instruction, the court's decision to give the instruction doesn't indicate that the trial judge had either a "substantial bent of mind" or prejudice against Peters. *See Jennings*, ¶ 28; *see also Sanders*, ¶¶ 45-46. Instead, the court was simply reminding the jury that it was its role to judge the credibility of *all* of the witnesses and to

determine the weight to be accorded the evidence, even when a witness testifies about another person's state of mind.

¶ 21    Because we perceive no actual bias, we decline to reverse on this ground or on the grounds that the trial court demonstrated an appearance of impropriety. *See Richardson v. People*, 2020 CO 46, ¶ 39 (Absent "evidence demonstrating actual judicial bias or prejudice, a trial judge's potential violation of [the ethical] rules does not mandate reversal.").

## B.    Whether the Trial Court Improperly Permitted R.L.'s Hearsay Statements

¶ 22    Peters next contends that the trial court erred by admitting hearsay statements that R.L. made to the police after the shooting. We aren't persuaded that the court erred.

### 1.    Additional Facts

¶ 23    During its case-in-chief, the prosecution called R.L. to testify about the events leading up to and surrounding M.P.'s death. During cross-examination of R.L., defense counsel questioned her about her use of "dabs" — a concentrated form of marijuana — before the shooting. R.L. testified that she had been "doing dabs" before the shooting.

11

¶ 24    After R.L. finished testifying, the prosecution called Sergeant Rebecca Smith, an officer who responded to the scene of the shooting, to testify. The prosecutor asked Sergeant Smith what information R.L. gave her at the scene, including the name of the shooter and what weapon was used. In response, Sergeant Smith stated that R.L. identified the shooter as Peters and she described the weapon as a black handgun. Peters objected to both responses based on hearsay. The prosecution argued that the statements were admissible as an excited utterance or as a prior consistent statement based on defense counsel's questioning of R.L. about her marijuana use. The court overruled the objection, agreeing that it was an excited utterance but stating that it wasn't a prior consistent statement.

¶ 25    The prosecutor continued questioning Sergeant Smith and asked her what happened at the door. Sergeant Smith responded,

> [R.L.] said that Mark Peters had come over and tried to force his way inside the door, and that she and her mother were trying to block the door to prevent him from coming in. During that time is when she saw the black handgun and, at one point, he fired a round through the door —

Peters made a hearsay objection and argued that the statement was a "narrative response" rather than an excited utterance and asked the court to strike Sergeant Smith's testimony. The court initially sustained the objection but allowed the prosecutor to make a record during a sidebar. The prosecutor again argued that Sergeant Smith's testimony was admissible as R.L.'s statement was an excited utterance or a prior consistent statement. The trial court then overruled the objection, finding that the statement was admissible as an excited utterance and as a prior consistent statement.

¶ 26 After the sidebar, the prosecutor requested that Sergeant Smith "finish out the statement" and asked her if R.L. ended her statement by saying "that Mark Peters shot [a round] through the door, hitting her mother in the head?" Sergeant Smith answered in the affirmative.

2. Standard of Review and Legal Principles

¶ 27 Hearsay is an out-of-court statement "offered in evidence to prove the truth of the matter asserted." CRE 801(c). Unless it's permitted by the rules of evidence, statute, or procedural rule, hearsay is inadmissible. CRE 802.

¶ 28    CRE 801(d)(1)(B) specifically governs the admission of prior consistent statements.  Under CRE 801(d)(1)(B), a statement isn't hearsay if "[t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . . consistent with the declarant witness's testimony and is offered to rebut an express or implied charge against the declarant witness of recent fabrication or improper influence or motive."  But our supreme court has held that prior consistent statements are admissible outside of CRE 801(d)(1)(B) when "used for rehabilitation when a witness' credibility has been attacked." *People v. Eppens*, 979 P.2d 14, 21 (Colo. 1999).

¶ 29    Notwithstanding this permitted use, there are still limitations on offering prior consistent statements for rehabilitative purposes. *Id.*  One such limitation is the relevancy and probative value of the statement under CRE 401, 402, and 403.  *Id.* at 21-22.  The trial court must evaluate the relevancy of a prior consistent statement offered for rehabilitative purposes and "determine whether the statements have some probative force bearing on the credibility of the witness beyond the mere fact that the witness has repeated on a prior occasion a statement consistent with his or her trial

testimony." *Id.* at 22. Further, in determining the admissibility of the statement, the trial court must consider "the prohibition against the needless presentation of cumulative evidence." *Id.*

¶ 30 Because the trial court must consider the relevancy and probative value as to credibility, the admissibility of a prior consistent statement "turns on the scope of impeachment and the attack on the witness's credibility." *People v. Miranda,* 2014 COA 102, ¶ 15. If the attack on a witness's credibility is "based on 'specific facts,'" then statements regarding only those facts are admissible, but if "the impeachment is general and not limited to specific facts . . . the jury should have access to all the relevant facts, including consistent and inconsistent statements." *Id.* at ¶ 16 (quoting *People v. Elie,* 148 P.3d 359, 362 (Colo. App. 2006)).

¶ 31 It's within the trial court's discretion to determine "what constitutes general impeachment." *Id.* at ¶ 17. "We review a trial court's evidentiary rulings for an abuse of discretion." *People v. Abdulla,* 2020 COA 109M, ¶ 61. "A trial court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair, or if it misapplies the law." *Id.*

15

¶ 32    When an issue is preserved, we apply the nonconstitutional

harmless error standard to a trial court's evidentiary rulings.

*People v. Martinez*, 2020 COA 141, ¶ 27; *see also Hagos*, ¶¶ 9, 12.

Under this standard, "reversal is warranted if the error affects the

substantial rights of the parties, meaning 'the error substantially

influenced the verdict or affected the fairness of the trial

proceedings.'" *Martinez*, ¶ 28 (quoting *Zapata v. People*, 2018 CO

82, ¶ 61).

### 3.    R.L.'s Hearsay Statements Were Properly Admitted as Prior Consistent Statements

¶ 33    To begin, we must determine the nature of the impeachment of

R.L.  That is, was it based on specific facts or was it general

impeachment?  Peters didn't impeach R.L. as to any specific

statements she made.  Rather, he impeached her by asking her

about her use of a highly concentrated form of marijuana before the

shooting.  This was a general attack on R.L.'s credibility.  Therefore,

the admission of R.L.'s prior consistent statements wasn't limited to

specific facts.

¶ 34    But even prior consistent statements offered in response to

general impeachment must be relevant and probative of the

16

witness's credibility to be admissible.  To assess the relevance and probative value of the prior consistent statements, we must first consider why Peters impeached R.L. by drawing the jury's attention to her drug use before the shooting.  Informing the jury that R.L. used marijuana impeached R.L. in two respects: (1) her ability to perceive events at the time they occurred and (2) her ability to accurately recall and testify about what happened.  R.L.'s prior consistent statements were only relevant to one of those inquiries.

¶ 35     The consistent statements — primarily that Peters "tried to force his way inside the door" and that he "shot [a round] through the door hitting [M.P.] in the head" — weren't relevant to or probative of R.L.'s ability to perceive what occurred during the shooting.  The statements don't in any way confirm that she accurately perceived what occurred during the shooting because the potential impediment to her accurate perception — her marijuana use — occurred before she made the statements to Sergeant Smith.  But her prior consistent statements were relevant to and probative of her ability to accurately recall and testify at trial about what happened.  The statements are relevant in this regard because they confirm the accuracy of her memory at trial and they're probative

17

because they show that the use of marijuana before the shooting didn't degrade her recollection of what happened at trial compared to immediately following the shooting. Accordingly, the trial court didn't abuse its discretion by admitting R.L.'s hearsay statements as prior consistent statements.

¶ 36     But even if the trial court shouldn't have admitted R.L.'s statements to the sergeant as prior consistent statements, any error was harmless. The statements elicited by the prosecution from the sergeant didn't introduce any new evidence and were merely cumulative of R.L.'s own testimony about the events surrounding the shooting. Peters extensively cross-examined R.L. about the incident itself, and the sergeant's testimony about R.L.'s hearsay statements was brief, consisting of approximately one page of testimony. Thus, any error by the court in admitting R.L.'s hearsay statements was harmless.

¶ 37     Peters claims that the admission of R.L.'s hearsay statements wasn't harmless because "R.L.'s credibility was crucial to the outcome," and the introduction of the statements "improperly bolster[ed] her credibility." We acknowledge that R.L.'s testimony was important, particularly for the burglary charge because there

was conflicting evidence about whether Peters entered the home. But we can't discern how Sergeant Smith's testimony *improperly bolstered* R.L.'s testimony or credibility. While Sergeant Smith testified about R.L.'s statements after the shooting, she didn't assert that R.L. was credible. And to the extent that Sergeant Smith's testimony had a bearing on R.L.'s credibility, it was because she testified to prior consistent statements by R.L. — an entirely proper purpose, not improper bolstering.

¶ 38    Because we conclude that R.L.'s hearsay statements were properly admitted as prior consistent statements, or in the alternative that their admission was harmless, we decline to address whether the trial court erred by admitting the statements as excited utterances.

## C.    Prosecutorial Misconduct

¶ 39    Peters next contends that his convictions for murder and burglary must be reversed because of prosecutorial misconduct. Peters alleges that there were six instances of prosecutorial misconduct that either individually or collectively merit reversal. After discussing the appropriate standard of review, we address

each alleged instance in turn and conclude that reversal isn't
warranted.

### 1. Standard of Review

¶ 40     When reviewing claims of prosecutorial misconduct, we engage in a two-step analysis. *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010). First, we "determine whether the prosecutor's questionable conduct was improper based on the totality of the circumstances and, second, whether such actions warrant reversal according to the proper standard of review." *Id.* Because these steps are "analytically independent of the other," we could conclude that the prosecutor's conduct was improper but decline to reverse the judgment because the error was harmless. *Id.*

¶ 41     The standard of review we apply after determining prosecutorial impropriety "varies depending on the circumstances." *Id.* at 1097. If an error "specifically and directly offend[s] a defendant's constitutional rights," and the defendant contemporaneously objected at trial, then the error is subject to constitutional harmless error review. *Id.*; *see also Hagos*, ¶ 11. Constitutional harmless errors require reversal unless the error "was harmless beyond a reasonable doubt." *Hagos*, ¶ 11 (quoting

*Chapman v. California*, 386 U.S. 18, 24 (1967)). If the error isn't of constitutional magnitude, and the defendant contemporaneously objected at trial, we subject the prosecutor's misconduct to "general harmless error review." *Wend*, 235 P.3d at 1097. Under this type of review, we only reverse "if the error affects the substantial rights of the parties." *Hagos*, ¶ 12.

¶ 42     But if the defendant fails to contemporaneously object to the prosecutor's misconduct — whether the misconduct implicates a constitutional right or not — then we review for plain error. *Wend*, 235 P.3d at 1097; *see also Hagos*, ¶ 14. Prosecutorial misconduct constitutes plain error if it's "'flagrant or glaringly or tremendously improper' and so undermine[s] the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction." *People v. Carian*, 2017 COA 106, ¶ 52 (quoting *People v. Cevallos-Acosta*, 140 P.3d 116, 122 (Colo. App. 2005)).

¶ 43     If we conclude that a prosecutor's statements were improper, we must then determine whether "they affected the fundamental fairness of the trial" by "examin[ing] a variety of factors under the totality of the circumstances." *Id.* at ¶ 55. The factors we examine

include "the exact language used, the nature of the misconduct, the degree of prejudice associated with the misconduct, the surrounding context, . . . the strength of the other evidence of guilt," . . . "the severity and frequency of the misconduct[,] . . . and the likelihood that the misconduct constituted a material factor leading to the defendant's conviction."

*Id.* (alterations in original) (quoting *People v. Cordova*, 293 P.3d 114, 122 (Colo. App. 2011)).

### 2. Whether the Prosecution Improperly Used a Generic Tailoring Hypothetical

¶ 44 Peters contends that during voir dire the prosecutor made an improper generic tailoring argument. We agree that the prosecutor improperly used a generic tailoring hypothetical but conclude that the use of the improper hypothetical was harmless.

### a. Additional Facts

¶ 45 Twice during voir dire, the prosecutor posed a hypothetical to the jurors in which the prosecutor owned a store at which the jurors were employed, and the prosecutor discovered that money was missing from the store's safe. As part of the hypothetical, the prosecutor told one juror that they were the thief and then told that juror that he was going to question each "employee" and ask them

22

about the theft.  The first time the prosecutor used this hypothetical, he asked the juror he told was the thief,

> Is it advantageous [to you if] I start with you and try to pin you down on a story first, or is it better for you to wait and have me start on that side so you can hear where everybody was and what everybody was saying so you can craft your story?

¶ 46    In response, the juror stated, "The more information I have, the more beneficial it is for me."  The prosecutor then asked other jurors if they agreed.  They did.  Peters didn't object at this time.

¶ 47    During the prosecutor's second attempt to use the hypothetical, Peters objected on the grounds that it violated due process because he would testify last.  The court sustained the objection.

### b.    Application

¶ 48    A prosecutor makes a "tailoring argument" when the "prosecutor asserts that, by virtue of the defendant's presence at trial, the defendant 'tailor[ed] his testimony to fit that of other witnesses.'"  *Martinez,* ¶ 55 (quoting *Martinez v. People,* 244 P.3d 135, 141 (Colo. 2010)).  There are two types of tailoring arguments: specific and generic.  *Id.* at ¶ 56.  Specific tailoring arguments are

"tied to evidence in the record." *Id.* at ¶ 57 (citation omitted). In contrast, "[g]eneric tailoring arguments occur when the prosecution attacks the defendant's credibility by simply drawing the jury's attention to the defendant's presence at trial and his resultant opportunity to tailor his testimony." *Id.* at ¶ 56 (citation omitted). Generic tailoring arguments "are improper because 'they are not based on reasonable inferences from evidence in the record,' and they imply that the defendant is less believable because he or she exercised the right of confrontation and upheld his or her statutory duty to be present at trial." *Id.* (citation omitted). An example of an improper generic tailoring argument is telling the jury that the defendant "got to sit and listen to the evidence, and then testify, based upon the evidence heard in court." *People v. Knapp*, 2020 COA 107, ¶¶ 58-59.

¶ 49 The prosecutor's hypothetical in this case isn't a tailoring *argument* because, during voir dire, the prosecutor couldn't have known that Peters would testify and therefore couldn't have *argued* that Peters's testimony would be tailored. It is, however, a tailoring *hypothetical*, as the hypothetical plants the seed of tailoring. It's an improper tailoring hypothetical at that, as it implies that if Peters

24

were to testify, his testimony would be tailored. And, because the prosecutor used the hypothetical during voir dire, before any evidence had been presented, the hypothetical couldn't be a *specific* tailoring hypothetical based on reasonable inference from the facts. Instead it was a *generic* tailoring hypothetical suggesting that Peters would be less believable if he testified simply because he exercised his right to confrontation and sat through trial. The hypothetical was therefore improper.

¶ 50 That the prosecutor's hypothetical was improper, however, doesn't necessarily mean his use of it warrants reversal. Because Peters didn't object to the first hypothetical, we review the prosecutor's misconduct in that instance for plain error. *See Wend*, 235 P.3d at 1097. And because the trial court sustained Peters's objection to the hypothetical the second time, the use of the hypothetical in that instance doesn't constitute error. *See People v. Douglas*, 2012 COA 57, ¶ 65 (declining to review an allegedly improper comment by the prosecutor where the defendant's objection to the comment was sustained and he requested no further relief).

25

¶ 51     Here, considering the totality of the circumstances, we conclude that reversal isn't warranted. While the prosecutor invoked the same hypothetical in two instances, the hypothetical didn't directly assert that Peters would tailor his testimony, if he testified. Further, the hypothetical was brief, and most importantly, the prosecutor made no reference to this hypothetical at any point during trial (including closing arguments) and never advanced a tailoring argument. Thus, the prosecutor's use of an improper generic tailoring hypothetical during voir dire doesn't warrant reversal under the plain error standard of review.

     3.     Whether the Prosecution Improperly Pre-Tried Its Case

¶ 52     Peters next contends that the prosecution attempted to improperly pre-try its case during voir dire based on its use of two hypotheticals. We aren't persuaded.

     a.     Additional Facts

¶ 53     Both hypotheticals at issue were presented during voir dire. The first — the store hypothetical — is discussed *supra* in Part II.C.2. The second hypothetical was posed to a juror as follows:

> So one of my friends, he had a small child who
> ended up getting into the cookie jar. . . .
> [Dad] . . . looks at his son, and his son has

cookie crumbs on his chest. So he goes in and he looks at the cookie jar. While there had been quite a few cookies, clearly about 20 or whatever, now there's only about three. He then goes and confronts the child. "Hey, have you had any cookies today?" What do you think the child says?

¶ 54    After the prosecutor posed the cookie hypothetical, the juror responded that the child would say "no." The prosecutor then proceeded to ask, "[W]hat do you think is going to happen when he asked him, 'Well, what are these cookie crumbs on your chest? Are you sure you didn't have any?'" The prosecutor told the juror that the child said, "I may have had two cookies." The prosecutor then discussed this being an instance of a child "minimizing their guilt" and went on to state that adults similarly minimize guilt by saying, "I can't get away with this crime completely, but I'm going to minimize the ramifications of it." Peters didn't object to the prosecutor's cookie hypothetical.

¶ 55    The prosecutor used the same cookie hypothetical later during voir dire. On the second occasion, the prosecutor asked the jurors whether they would be "able to look out for that sort of behavior." Peters objected, but not contemporaneously. Peters requested that the court instruct the jury on Peters's constitutional right to present

27

a defense. The trial court subsequently reiterated to the jury that the defendant maintains a presumption of innocence, the burden of proof is on the prosecution, and the defendant maintains a right to present a defense.

### b. Application

¶ 56 During voir dire, "[a] prosecutor engages in prosecutorial misconduct . . . when she misstates the law or 'intentionally uses[s] the voir dire to present factual matter which the prosecutor knows will not be admissible at trial or to argue the prosecution's case to the jury.'" *People v. Krueger*, 2012 COA 80, ¶ 50 (quoting *People v. Adams*, 708 P.2d 813, 815 (Colo. App. 1985)). Significant in our determination of whether a prosecutor's challenged remarks constitute prosecutorial misconduct is the context in which the remarks were made. *Id.*

¶ 57 While it appears that each hypothetical was meant to gain insight into the jurors' perspectives on certain legal issues, we conclude that neither hypothetical was an improper attempt by the prosecutor to "pre-try" the case. Although the store hypothetical was improper as a generic tailoring hypothetical, there is no indication that the prosecutor misstated the law or argued the

28

prosecution's case through the hypothetical. Indeed, the prosecutor didn't link the hypothetical to Peters's right to testify or explicitly argue that, if Peters testified, his testimony would be tailored.

¶ 58 For similar reasons, we conclude that the prosecutor didn't use the cookie hypothetical to pre-try the case. Again, the prosecutor didn't tell the jurors how the hypothetical related to the law or inform jurors that the hypothetical was in reference to the defendant's affirmative defense of self-defense. Further, while the prosecutor asked jurors if they could "look out for" minimization in the trial, the prosecutor didn't reference any facts of the case.

¶ 59 Thus, neither hypothetical was improper on the grounds that the prosecution was attempting to "pre-try" its case.

### 4. Whether the Prosecution Improperly Analogized Reasonable Doubt

¶ 60 Peters next contends that the prosecutor acted improperly by trivializing the reasonable doubt standard. We agree that portions of the prosecutor's statements on reasonable doubt were improper but disagree that any error is reversible.

### a. Additional Facts

¶ 61    During voir dire, the prosecutor asked a juror who had served on a jury before whether they found the reasonable doubt standard "confusing." After the juror responded that they didn't, the prosecutor asked: "Do you feel like it may be something that you do every day in your life? You kind of, like, look at things and figure out, you know, is there a doubt that this thing's going to happen or a reasonable doubt that that thing is going to happen?" The juror responded in the affirmative. Peters didn't contemporaneously object.

¶ 62    Additionally, twice during voir dire, the prosecutor used the judge to explain the reasonable doubt standard. Both times, the prosecutor asked the jurors whether they believed, beyond a reasonable doubt, that the trial judge was "an actual judge." The prosecutor then asked the venire members various questions, such as whether they had seen the governor's appointment of the judge or the judge's law degree. Peters didn't contemporaneously object to either analogy but voiced a delayed objection following the second analogy. During his delayed objection, Peters requested that the trial court instruct the jury on the reasonable doubt standard "and

differentiate the distinction between a trivial identification of a very iconic member of the court than with the very high standard and burden . . . of proof beyond a reasonable doubt." The court subsequently gave the reasonable doubt instruction and stated that the attorneys were being permitted "latitude" in discussing analogies but that the analogies don't "supplant[] or in some way offer[] a different explanation or viewpoint or perspective on what reasonable doubt is."

### b. Application

¶ 63    We first address whether the prosecutor's question about the reasonable doubt standard and everyday decisions was improper.

¶ 64    Prosecutors "may not 'misstate the evidence or the law.'" *People v. Camarigg*, 2017 COA 115M, ¶ 40 (quoting *Krueger*, ¶ 50). In most circumstances, equating the reasonable doubt standard to an everyday choice is improper. *See id.* at ¶ 46 ("[U]sing a puzzle analogy to equate the burden of proof to an everyday choice can be improper."). In this case, the prosecutor didn't directly equate the reasonable doubt standard to everyday choices. Rather, the prosecutor asked the juror if using the reasonable doubt standard is something they do in their everyday life. Notwithstanding the

31

indirectness of the prosecutor's analogy, the question was improper because it implies that the reasonable doubt standard is akin to everyday decision-making, trivializing the standard.

¶ 65    Next, we address whether the prosecutor's question about whether the judge was a judge beyond a reasonable doubt was improper.  Certain reasonable doubt analogies can be "perilous and unhelpful." *People v. Vialpando*, 2022 CO 28, ¶¶ 35, 41.  We agree with Peters that this analogy was improper as it used the status of an iconic courtroom figure — the judge — to illustrate reasonable doubt, potentially misleading or confusing the jury regarding the burden of proof.  *Cf. Camarigg*, ¶ 47 (noting that puzzle analogies used to illustrate reasonable doubt "are problematic if they use iconic images").

¶ 66    But even though the prosecutor's reference to everyday decision-making and analogies about the status of the judge were improper, we still conclude that reversal isn't warranted.  Because Peters didn't contemporaneously object to any of the reasonable doubt analogies, we review for plain error.  When the prosecutor made the everyday decisions analogy and the judge analogies, each analogy was brief, and Peters doesn't point us to any evidence that

32

the prosecutor referred back to the analogies later on in the trial. This reduces the likelihood that the analogies undermined the fundamental fairness of the trial. *See Vialpando*, ¶¶ 35, 41 (concluding that the prosecutor's question asking whether the jurors "could recognize, beyond a reasonable doubt, the American flag in the courtroom even though it was folded and not entirely visible" and analogizing to a gameshow didn't "lower the burden of proof and were not prejudicial" because the trial court instructed the jury multiple times to only follow the court's instructions, the prosecutor's analogies were brief and isolated, and the prosecutor didn't raise the analogies during closing argument); *see also People v. Van Meter*, 2018 COA 13, ¶¶ 32-33 (prosecutor's puzzle analogy was improper but not plain error, in part because the use of the analogy "was relatively brief and isolated" and the trial court properly instructed the jury on reasonable doubt multiple times).

¶ 67    Further, when Peters belatedly objected to the judge analogy the second time, his requested relief was for the trial court to read the proper reasonable doubt standard to the jury, which the trial court did. And, on review, "we presume that the jury followed the court's instructions." *Vialpando*, ¶ 41. This reduced the risk of

33

prejudice.  *See id.*; *see also Van Meter*, ¶ 33.  Thus, we conclude

that any error in permitting the analogies wasn't plain and, to the

extent it constituted prosecutorial misconduct, it doesn't warrant

reversal.

5.    Whether the Prosecution Undermined the Presumption of
Innocence

¶ 68    Peters next contends that, during voir dire, the prosecutor

"undermined the presumption of innocence."  We disagree that the

prosecutor engaged in misconduct.

a.    Additional Facts

¶ 69    During voir dire, the prosecutor stated,

> So, folks, like I said, part of it is managing
> expectations, and we have had people say,
> "You know what? Before I sign a guilty verdict,
> I want to be 100 percent sure of this."
>
> And when they say stuff like that, I kind of
> cringe because that means the burden of proof
> has gone up.  *And if the burden of proof goes*
> *up, that means it's a lot easier to get away with*
> *crimes.*

(Emphasis added.)  The prosecutor followed this up by asking jurors

what would happen if the burden was lowered.  The prosecutor

then said, "[I]f that burden gets lowered that means the risk of

34

someone being convicted when they're innocent rises, right?"

Peters didn't object to either of the prosecutor's statements.

### b.    Application

¶ 70    Because Peters didn't object, we review this contention for plain error.  While the prosecutor's statements were ill-advised, we conclude that they weren't improper, and even if they were improper, they didn't constitute reversible prosecutorial misconduct.

¶ 71    It doesn't misstate the law to distinguish between proof beyond a reasonable doubt and proof beyond all doubt.  *See People v. Pettigrew*, 2020 COA 46, ¶ 20 ("It is not reversible error for a court to distinguish the fictional 'beyond a shadow of a doubt' standard from the constitutionally mandated beyond a reasonable doubt standard."), *aff'd on other grounds*, 2022 CO 2.  Though inartful, this is the essence of the prosecutor's statement.  Further, the prosecutor balanced out the statement by informing the jury that by lowering the burden of proof, "the risk of someone being convicted when they're innocent rises."  We therefore conclude that the statement, particularly when viewed in context, wasn't improper.

## 6. Whether the Prosecution Improperly Invoked Religious Themes

¶ 72    Peters next contends that the prosecutor "improperly appealed to the passions and sympathies of the jury by invoking religious themes during closing argument." We disagree that the prosecutor acted improperly.

### a. Additional Facts

¶ 73    During cross-examination of Peters, the prosecutor questioned Peters about text messages that he had sent to M.P., and the following exchange occurred:

> [Prosecutor:] Sir, I'm going to leave with kind of one last kind of line of questioning. It goes back to the text messages. You said in there numerous times, "I will come as a thief in the night"?
>
> [Peters:] Yes.
>
> [Prosecutor:] With regards to those statements, I also noticed in there that talked about another Bible quote and it was, "I thought you were a virtuous wife," quoting Proverbs 31?
>
> [Peters:] Yeah.
>
> [Prosecutor:] And when you made the comments of a thief in the night, you also specifically mentioned that, "Like a thief in the night, the Bible says."
>
> [Peters:] Okay.

[Prosecutor:] What's that a reference to?

[Peters:] About the time when God's coming back, Jesus.

[Prosecutor:] Right. It is a reference to the second coming of Christ where he will come when nobody is expecting —

[Peters:] I don't need a lesson on the Bible from you.

[Prosecutor:] I'm asking you whether or not you agree with this.

[Peters:] Excuse me?

[Prosecutor:] I'm asking you what your opinion is. Isn't it true that thief in the night refers to the second coming of Christ; when Christ will come when nobody is expecting it and pass judgment upon all of the sinners?

[Peters:] Yeah.

[Defense Counsel:] Objection, Your Honor. That's a mischaracterization of the rapture. It also has no relevance about what the Bible teaches.

THE COURT: I'm going to permit the question to be posed to this witness if that's what he believes the passage is referencing, given that this witness has indicated he made reference to the passage.

[Peters:] I wasn't giving it all the thought you just gave it, put it that way.

¶ 74    During closing arguments, the prosecutor discussed the "thief

in the night" text message:

> And like much of his testimony the other day,
> he just thinks this was a little bit of ranting.
> Doesn't know what it means.  But when I
> asked him specifically, he agreed with me and
> said this phrase is about the second coming of
> Christ where He shall pass judgment upon all
> those, and He shall come in the middle of the
> night like a thief in the night.
>
> And we know that he knows his Bible because
> he actually said to me, You are going to lecture
> me about the Bible?  Meaning, he knows about
> it.  But when he's asked by me and asked by
> you, What did you mean when you said this,
> he refused to say.  He said, I don't know.
> Folks, that was not the real Mark Peters.  This
> is the real Mark Peters.
>
> So he came when they didn't expect it.  When
> they didn't know it was coming.  Sneaking up
> on their home.  And instead of coming cloaked
> in night in darkness, he came cloaked with a
> wig and pamphlets.  Very cleverly done.  So
> that he could turn his head.  They wouldn't
> know it was him and just think it was [a]
> roofer canvasser, which is interesting because
> they all work in the roofing business.  He knew
> exactly what he was doing.  And he passed
> judgment fulfilling his own words.

Peters didn't object to this argument.

## b. Application

¶ 75    Prosecutors "must avoid arguments that are calculated to appeal to jurors' biases and prejudices." *People v. Nardine*, 2016 COA 85, ¶ 46. Because religion may appeal to a juror's biases and prejudices, it's improper for the prosecution to appeal to the jurors' religious beliefs. *See id.* Further, it is improper for the jury to consider Bible passages when deliberating on a case. *See People v. Harlan*, 109 P.3d 616, 631 (Colo. 2005) (upholding trial court's decision to vacate defendant's death sentence after jurors considered extraneous Bible passages).

¶ 76    Peters contends that by questioning Peters about this Bible passage and later referring to the passage in closing argument, the prosecutor "improperly encouraged the jury to consider religious themes" and "improperly appealed to the passions and sympathies of the jury." But neither the prosecutor's questioning of Peters nor his statements during closing argument were designed to appeal to the religiosity or passions of the jurors. Further, the Bible passage wasn't extraneous to the case because the text messages at issue were admitted into evidence and the message indicates that Peters was indeed referencing the Bible when he sent M.P. the messages.

39

Thus, the prosecutor's questioning and discussion of the Bible reference by Peters in his messages, when viewed in context, weren't improper.

### 7. Whether it was Improper for the Prosecution to Request the Jury to Hold Peters Accountable

¶ 77    Peters next contends that the prosecutor acted improperly by asking the jury to hold Peters accountable. Again, we disagree.

### a.    Additional Facts

¶ 78    During closing statements, the prosecutor argued as follows:

> This is not a tragic accident. Please, do not treat it as such. And hold [Peters] accountable for the crimes he has committed of murder with intent and after deliberation, of kidnapping [R.Y.], of stalking [M.P.], trying to break into her home.
>
> Hold this man accountable. Don't let him minimize this as much as he wants to. Because you know the real . . . Mark Peters. You know who he is. Not the mellow guy he claimed to be.

Peters didn't object to this comment.

### b.    Application

¶ 79    During closing argument, a prosecutor is given wide latitude. *People v. Rhea*, 2014 COA 60, ¶ 46. But a prosecutor should limit argument to "evidence and reasonable inferences to be drawn

40

therefrom on the issue of whether the prosecutor has proved guilt beyond a reasonable doubt." *Nardine*, ¶ 35. And "[a] prosecutor may not use arguments calculated to inflame the passions and prejudices of the jury, denigrate defense counsel, misstate the evidence, or assert a personal opinion as to the credibility of witnesses." *Id.*

¶ 80    Because of these limitations, divisions of this court have deemed arguments asking a jury to "hold a defendant accountable" when made in a context that could "mislead the jury from its duty to decide the charges," *Carian*, ¶¶ 57, 58, or arguments that "pressure jurors to 'do justice' for a victim," *People v. Buckner*, 2022 COA 14, ¶ 42, to be improper. But here the prosecutor made the argument after going through the elements of the offenses and arguing how the evidence presented at trial satisfied each element of each offense. And the prosecutor didn't argue that the jury should hold Peters accountable for what he did to a sympathetic victim, but that it should hold him accountable for the crimes he committed. Simply put, an accountability argument isn't improper when made in the context of arguing that the evidence established the defendant's guilt. *People v. Tran*, 2020 COA 99, ¶ 68. Because

41

that's the argument the prosecutor made, we conclude that it wasn't improper.

## D. Cumulative Error

¶ 81 Peters contends that he was deprived of a fair trial because of cumulative errors. We disagree.

¶ 82 Although errors may be harmless or not affect the defendant's substantial rights in isolation, "reversal will nevertheless be required when 'the cumulative effect of [multiple] errors and defects substantially affected the fairness of the trial proceedings and the integrity of the fact-finding process.'" *Howard-Walker v. People*, 2019 CO 69, ¶ 24 (quoting *People v. Lucero*, 615 P.2d 660, 666 (Colo. 1980)). For reversal based on cumulative error, there must be "cumulative prejudice." *Id.* at ¶ 25.

¶ 83 In this case, we discerned error with respect to two instances of prosecutorial misconduct during voir dire — the generic tailoring hypothetical and trivializing reasonable doubt — and assessed the hearsay challenge to Sergeant Smith's testimony about R.L.'s statements for harmlessness. But even taking these three instances of error or assumed error together, we don't perceive cumulative prejudice for largely the same reasons we found the

alleged errors to be individually harmless. Both of the instances of prosecutorial misconduct occurred during voir dire, were remedied by proper instructions from the court, and were never referenced again during the course of a nine-day trial. And Sergent Smith's challenged testimony was cumulative of R.L.'s testimony. Moreover, the two instances of prosecutorial misconduct and the one assumed evidentiary error were independent and didn't compound one another. Thus, reversal on the basis of cumulative error isn't warranted.

### E.  Constitutionality of Peters's Sentence

¶ 84 Peters contends that we must vacate his sentence for LWOP because it's cruel and unusual under both the United States and Colorado Constitutions. In advancing this contention, Peters asks us to conclude that a sentence of LWOP for felony murder is categorically forbidden under the United States and Colorado Constitutions. The People dispute whether this issue is preserved for our review. But even if Peters preserved this argument, we aren't persuaded that it merits reversal.

¶ 85 At the time Peters appealed his judgment, our supreme court had not yet determined whether an LWOP sentence for felony

murder is categorically unconstitutional. But recently our supreme court held that under the Eighth Amendment and article II, section 20 of the Colorado Constitution, "an LWOP sentence for felony murder for an adult offender is not categorically unconstitutional." *Sellers v. People*, 2024 CO 64, ¶¶ 2, 37. We are bound by this determination. *See People v. Cox*, 2021 COA 68, ¶ 8. Thus, we can't conclude that the trial court erred by sentencing Peters to LWOP.

## III.  Disposition

¶ 86    The judgment and sentence are affirmed.

JUDGE BROWN and JUDGE MOULTRIE concur.